IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEPHEN LEIGHT,                                    No. 3:15-cv-01410-HZ

          Plaintiff,

   v.

UNION SECURITY INSURANCE                           FINDINGS OF FACT &
COMPANY,                                           CONCLUSIONS OF LAW

          Defendant.

Ralph E. Wiser
1 Centerpointe Drive, Suite 570
Lake Oswego, Oregon 97035

P. Randall Noah
LAW OFFICES OF P. RANDALL NOAH
21 Orinda Way, Suite C, #216
Orinda, California 94563

      Attorneys for Plaintiff

/ / /

/ / /

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Katherine S. Somervell
BULLIVANT HOUSER BAILEY PC
300 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204

Horace W. Green
BUCHMAN PROVINE BROTHERS SMITH LLP
2033 N. Main Street, Suite 720
Walnut Creek, California 94596

       Attorneys for Defendant

HERNANDEZ, District Judge:

       Plaintiff Stephen Leight brings this action against Defendant Union Security Insurance

Company under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461

(ERISA), challenging the termination of his long-term disability insurance benefits.  Plaintiff's

benefits were discontinued after two years because of a mental illness limitation in his insurance

policy.  Both parties move for summary judgment.  As explained below, I construe the motions

as Trial Memoranda submitted in connection with a bench trial on the Administrative Record.

Fed. R. Civ. P. 52(a).  Based on my review of the record, and my consideration of the parties'

arguments, I enter Judgment for Plaintiff.

BACKGROUND

       Plaintiff obtained disability insurance as a benefit of his employment with KVD

Company.  Green Decl. Ex. 1, 1-34; ECF 41-1 (Group Long Term Disability (LTD) Policy issued

to KVD Company) ("the LTD Policy").  Plaintiff began working for KVD Company in October

1999, and worked as a software engineer.  AR 169, 407, 717.[1]

---

    [1] Citations to "AR" are to the Administrative Record, which is Exhibit 2 to Green's
Declaration; ECF 41-2 - 41-12.

2 - FINDINGS OF FACT & CONCLUSIONS OF LAW

I.  The Policy

       The LTD Policy provides for a disability income benefit for eligible employees if the

qualifying period is satisfied and the person is under the regular care and attendance of a doctor.

LTD Policy 20.  "Disabled" "means that in a particular month or portion of a month, the person

satisfies the Total Disability Test or the Partial Disability Test."  Id. at 9.  The "Total Disability

Test" is defined as follows:

-    during the first 36 months of a *period of disability* (including the *qualifying period*) an *injury*, sickness or pregnancy prevents you from performing with reasonable continuity one or more of the *substantial and material acts* necessary to pursue your *usual occupation* and you are not working in your *usual occupation*.

-    after the first 36 months of a *period of disability*, an *injury*, sickness, or pregnancy prevents you from engaging with reasonable continuity in any *occupation* in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

Id.

       This familiar distinction between a person's "own" occupation and "any" occupation is

further limited by provisions addressing "Special Conditions" and "Mental Illness."  The LTD

Policy limits benefits to twenty-four months for "Special Conditions" if the person is limited by

one or more of the "stated conditions" and "you do not have other conditions which, in the

absence of the stated conditions, would continue to exist, limit your activities, and lead us to

conclude that you were *disabled*."  Id. at 25.  The "stated conditions" subject to the "Special

Conditions" provision include "Mental Illness."  Id. at 14.

       "Mental Illness" is defined in the LTD Policy as

a mental disorder listed in the Diagnostic and Statistical Manual for Mental
Disorders, Fourth Edition, Text Revision, as published by the American
Psychiatric Association.  A *mental illness*, as so defined, may be related to or be
caused by physical or biological factors, or result in physical symptoms or
expressions.  For the purposes of the *policy*, *mental illness* does not include any
mental disorder listed within any of the following categories found in the
Diagnostic and Statistical Manual of Mental Disorders, as published by the
American Psychiatric Association:

* * *

- Pervasive Developmental Disorders[.]

Id. at 11.

II.  Plaintiff's Claim History

Plaintiff applied for disability coverage under the LTD Policy on July 12, 2012, alleging

an inability to work beginning May 14, 2012.  Id. at 717.  He asserted that he suffered from

anxiety, depression, and sleep problems.  Id.  As part of its determination of Plaintiff's claim,

Defendant interviewed Plaintiff over the telephone, obtained treatment records from treating

physician Dr. Christopher Benbow, performed a Behavioral Health Services Assessment, and

spoke with treating physician Dr. Scott Babe.  Id. at 42, 708-14, 43, 173-5, 177, 183.  Defendant's

staff psychologist Patricia Neubauer, Ph.D, completed the Behavioral Health Services

Assessment and spoke with Dr. Babe.  Id. at 173-75, 177.

Dr. Benbow's records from 2012 noted Plaintiff's anxiety and depression and treatment

with various prescription medications including Seroquel, Celexa, Xanax, and Viibryd.  Id. at

709-14.  His records also indicated that Plaintiff recently purchased a home in Oregon, hoping to

be able to continue working for his employer remotely.  Id.  The employer rejected the idea.  Id.

In talking to Defendant's claim representative, Plaintiff reported that he could not concentrate, he

4 - FINDINGS OF FACT & CONCLUSIONS OF LAW

was bothered and agitated by sounds, and sometimes he felt like he could not even open his eyes. Id. at 42.  Plaintiff reported a long history of struggling with depression.  Id.  He believed his work product was suffering and he decided to "go out" on disability.  Id.  He felt that none of the drugs he had tried had been successful.  Id.  In August 2012, he informed Defendant that he had moved to Oregon and that his new psychiatrist was Dr. Babe.  Id. at 43.  He told Defendant that Dr. Babe had diagnosed him with Asperger's Disorder.  Id.

As part of her Behavioral Health Services Assessment, Dr. Neubauer reviewed Plaintiff's initial claim and reviewed Dr. Benbow's 2012 records.  Id. at 173-75.  She noted Plaintiff's long-standing history of chronic depression, but concluded that the information provided was not conclusive of a major depressive disorder as opposed to a dysthymic disorder.  Id.  She also commented that Plaintiff's significant difficulty with interpersonal interactions could be explained by Asperger's Disorder.  Id.  But, she noted that Asperger's Disorder is a developmental disorder which would not be expected to prevent him from working because it is longstanding and present throughout life cycles.  Id.

Dr. Neubauer's notes from her September 7, 2012 conversation with Dr. Babe indicate that he remarked that Plaintiff's clinical picture is "more complex" with changing diagnoses including depression, anxiety, bipolar disorder, Cyclothymia, and oppositional defiant disorder. Id. at 177.  Dr. Babe thought Plaintiff had Asperger's Disorder and "had flown below the radar." Id.  He noted that Plaintiff's significant interpersonal issues caused job issues.  Id.  Dr. Babe reported that Plaintiff has problems tolerating others' social behavior and then becomes depressed.  Id.  He wants to create relationships but is impeded by his anxiety.  Id.  Plaintiff had a "magical" belief that moving to Oregon would decrease his stress and that everything would be

5 - FINDINGS OF FACT & CONCLUSIONS OF LAW

wonderful.  Id.  Dr. Babe described Plaintiff as simplistic and hopeful in his views of what he can do.  Id.  He had problems focusing, and Dr. Babe opined that Plaintiff would be easily overwhelmed, even when attempting to perform familiar work from home.  Id.  He would definitely be overwhelmed by a return to a job setting.  Id.  Dr. Babe noted that Plaintiff is very anxious when he leaves his house, but that Plaintiff was forcing himself to do a couple of things. Id.

Dr. Neubauer also received a note from Dr. Benbow who said that while Plaintiff was under his care, Plaintiff was unable to work regularly and had frequent absenteeism due to problems with extreme anxiety and depression.  Id. at 182.  He noted that even when Plaintiff was able to go to his office, he was unable to engage in productive work.  Id.  He frequently became internally preoccupied or needed to go outside.  Id.  Dr. Benbow opined that Plaintiff had been unable to work productively for "quite some time" but he had a "supportive employer who was surprisingly tolerant."  Id.  Dr. Benbow noted that social anxiety was a prominent feature of Plaintiff's disorder and that Plaintiff did better outside of social settings.  Id.  The hope was that with a simpler life, Plaintiff might regain some of his functional abilities and gradually reintegrate into a more mainstream lifestyle.  Id.

Based on the additional information obtained from Dr. Babe and Dr. Benbow, Dr. Neubauer concluded that Plaintiff's anxiety limited his ability to work.  Id. at 183.  On November 6, 2012, Defendant informed Plaintiff that his claim was approved, with a disability onset date of May 14, 2012.  Tr. 256-58.   In the approval letter, Plaintiff was informed that the Special Conditions provision of the LTD Policy applied to his claim.  Id. at 257.

In March 2013, Donna Ashley, R.N., completed another Behavioral Health Services

Assessment of Plaintiff. Id. at 347. She reviewed information obtained by Dr. Babe, noting that his current diagnoses were major depressive disorder, recurrent, psychotic features; general anxiety disorder; and "rule out" Asperger's. Id. She also remarked on Plaintiff's continued problems with relationships, employment, and finances. Id. She noted his medications. Id. Ashley concluded that Plaintiff was incapable of returning to work unless it was a remote situation and even then, she remarked, Dr. Babe had indicated that he could not estimate Plaintiff's ability to function. Id. Plaintiff's anxiety continued to be severe. Id. Ashley determined that Plaintiff was unable to perform job duties or search for new employment due to symptoms related to his diagnosis. Id.

One year later, in March 2014, Dr. Neubauer completed a Supplemental Behavioral Health Services Assessment of Plaintiff. Id. at 379-80. She noted that under the "mental nervous/special conditions" provisions of the LTD Policy, Plaintiff's benefits would cease in August 2014 and that Plaintiff had asked for a review of this determination. Id. Plaintiff believed his claim should be extended because of his Asperger's Disorder. Id. Dr. Neubauer reviewed Dr. Babe's March 2013 supplemental report, upon which Ashley had relied the previous year. Id. She also noted that in a March 2014 conversation with Defendant's claims staff, Plaintiff reported having had Asperger's Disorder for a long time and now believed he could not work with the condition. Id. Plaintiff stated that depression and anxiety were symptoms of his Asperger's Disorder/autism spectrum disorder. Id. He hoped for a flexible, low stress, quiet job that allowed him to regain some of his life. Id.

In her report, Dr. Neubauer recited that Asperger's is part of the autism spectrum and is a pervasive developmental disorder with severe and sustained impairment in social interaction and

7 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the development of restricted, repetitive patterns of behavior, interests, and activities.  Id.  She

explained why Asperger's is distinct from other autistic disorders.  Id.  She noted that impairment

in reciprocal social interaction is sustained and there may be a failure to develop peer

relationships appropriate to developmental level.  Id.  She also noted possible impairment in

social adaptation.  Id.  She indicated that Asperger's Disorder is a "continuous and lifelong

disorder" and further, good verbal abilities can mask the severity of social dysfunction.  Id.

     Next, Dr. Neubauer concluded that the records showed no significant change in Plaintiff's

Asperger's Disorder since the onset of his claim.  Id.  She explained:

> What changed is depression and anxiety that developed relative to major
> depressive disorder and generalized anxiety disorder.  While he attributes these
> symptoms to his Asperger's, the symptoms are not physiologically attributable to
> the illness but rather part of an emotional response to his life circumstances,
> potentially lacking sufficient coping and the impact of the psychiatric illness that
> accompany his Asperger's diagnosis.

Id. at 380.

     Dr. Neubauer continued to conclude that Plaintiff's Asperger's was present when he was

able to work and it was his increased anxiety and depression, conditions subject to the special

conditions provision, which prevented him from working.  Id.  While Asperger's Disorder is a

pervasive developmental disorder, Dr. Neubauer concluded that it would not be limiting in the

absence of "the comorbid depression and anxiety."  Id.  Thus, the special condition/mental illness

limitation applied.  Id.

     In June 2014, Dr. Neubauer issued another Supplemental Behavioral Health Services

Assessment.  Id. at 457-59.  She had now reviewed several records from Dr. Babe, starting in

March 2013 and continuing to March 2014.  Id.  She concluded that the information from Dr.

Babe as well as information in "general literature" did not "corroborate" Plaintiff's statements that Asperger's Disorder was properly considered to be Plaintiff's limiting condition or that his depression and anxiety are part of Asperger's Disorder rather than comorbid diseases.  Id. at 458. She noted that Plaintiff functioned with his Asperger's Disorder for many years without depression and anxiety impacting him in the work setting.  Id.  She remarked that the available information supported a conclusion that the exacerbation of depression and anxiety comorbid to his Asperger's Disorder limited his ability to function in a work setting.  Id.  She found nothing in a "brief review" of Asperger's Disorder literature that supported a determination that overuse of cognitive abilities caused depression and anxiety.  Id.  At this point, her recommendation noted that if additional review became necessary, peer review by a psychiatrist specializing in pervasive developmental disorders and mood disorders would be necessary.  Id.  She included several specific questions if such a peer reviewing psychiatrist were used.  Id. at 458-59.

In August 2014, Claims Analyst Cherie Payton reviewed Plaintiff's claim file and determined that Plaintiff's Asperger's Disorder did not physically limit him from performing his job duties as a software developer/computer programmer.  Id. at 465.  Special Technician Sherry Schoonbeck reviewed the decision and agreed with the recommendation to deny benefits on the basis that Plaintiff's disabling conditions are Special Conditions as defined by the LTD Policy and are limited to twenty-four months of coverage.  Id.  Plaintiff was not disabled from any condition that is not a Special Condition and therefore, his benefits were to end on August 19, 2014.  Id.

In December 2014, Plaintiff appealed the termination of his LTD Policy benefits, disputing that his anxiety and depression were comorbid conditions with his Asperger's Disorder.

9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Id. at 522. Plaintiff included several documents as part of his appeal, including a letter citing to several research references regarding Asperger's Disorder and autism spectrum disorders, medical records, and a favorable disability decision from the Social Security Administration (SSA). Id. at 521.

Plaintiff's appeal also included an April 7, 2014 chart note from Dr. Babe where he continued to assert that Plaintiff's condition was Asperger's Disorder and Depression NOS. Tr. 569. Dr. Babe reiterated that throughout the years, Plaintiff had been diagnosed with bipolar disorder, depression, anxiety, and even psychotic disorders. Id. In Dr. Babe's opinion, however, his primary and fundamental diagnosis was Asperger's Disorder which creates complications such as depression and anxiety. Id. Although Plaintiff was previously able to function in the work environment, this was only because the circumstances were very specific and allowed him to contain the discomfort that Asperger's caused him in dealing with social circumstances. Id. After he was required to do new things at his job, he was no longer able to tolerate or control his severe symptoms. Id. Dr. Babe concluded that "his primary diagnosis is Asperger's which subsequently exacerbates and contributes to his tremendous anxiety and depression." Id.

The other medical records included in Plaintiff's appeal were treatment notes from Dr. Andrew Schiffman from 2007-2010. Id. at 528-50. They are not entirely legible, but they appear to show ongoing psychiatric treatment during that period for depression and anxiety. Id. Also included was a June 2, 2010 evaluation performed by psychiatrist Dr. Stephen Stahl, M.D., who saw Plaintiff at Dr. Schiffman's request for a psychopharmacological evaluation. Id. at 551. Plaintiff described a long history of depression, including a hospitalization in high school and later, one suicide attempt. Id. At some point, Plaintiff stopped taking anti-depressant medication

10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

and treated his depression with exercise, strenuous hiking, and strenuous biking.  Id.  Then, in

approximately 2006, he inexplicably become much more anxious.  Id.  Dr. Stahl went through

both Plaintiff's and his family's medical history and performed a mental status exam.  Id. at 551-

53.  He opined that Plaintiff had probable organic anxiety disorder secondary to encephalitis,

superimposed upon a preexisting depressive disorder.  Id. at 552.  Dr. Stahl made suggestions for

medications.  Id. at 553.

Also included in the appeal documents was a December 10, 2014 letter from Dr. Babe

who stated that Plaintiff's primary diagnosis was Asperger's Disorder which he had had

throughout his life.  Id. at 527.  Dr. Babe believed that Plaintiff was able to cope in his work life

by "break[ing] things down into parts" and because he worked in a very circumscribed, specific

area within his company.  Id.  As the job demands and requirements became "increasingly

difficult and required significantly greater mental flexibility, he began to deteriorate."  Id.  The

mental flexibility now required of him included the need to interact and be around others and to

tolerate normal work environments without irritation.  Id.  Plaintiff, like many Asperger's

Disorder patients, has a sensory integration problem, and loud, noisy, or even quiet environments

with unpredictable or distracting noise, can create problems.  Id.

Dr. Babe also noted that while Plaintiff worked hard to maintain a socially normal

appearance around others, this required an overwhelming amount of mental calculation.  Id.  This

requirement, along with the unpredictable environment, created increasing anxiety and as he

began to fail within his work and social life, he became depressed.  Id.  In Dr. Babe's opinion,

"[a]tlhough . . . fear, anxiety, and depression have been present for a long time, [Plaintiff] clearly

was able to function at work until[] the demands of the job overwhelmed his Asperger's Disorder

11 - FINDINGS OF FACT & CONCLUSIONS OF LAW

and sensory integration condition." Id.

On January 6, 2015, Defendant's Appeals Specialist Michele Falen recommended obtaining a peer review with the questions provided by Dr. Neubauer.  Tr. 571-74.  Dr. Melvyn Lurie, M.D., a board-certified psychiatrist, performed a medical record review and wrote a twenty-page report dated January 21, 2015.  Id. at 577-97.  He did not personally examine Plaintiff.  Although he attempted to speak with Dr. Babe, Dr. Babe "could not/would not" communicate with Dr. Lurie absent a release from Plaintiff.  Id. at 590.  Dr. Lurie's report states that Defendant was informed of this but "[t]he decision was made to complete the report without [Dr. Babe's] input."  Id. at 590.

In addition to reviewing the medical records of Dr. Schiffman, Dr. Stahl, Dr. Benbow, and Dr. Babe, Dr. Lurie reviewed Plaintiff's SSA disability decision.  Id. at 588-89; see also id. at 485-97 (SSA Administrative Law Judge (ALJ) Favorable Decision).  Dr. Lurie also reviewed Plaintiff's resume, an activities questionnaire, and a job summary.  Id. at 589-90.

In his report, Dr. Lurie noted that the most recent Diagnostic & Statistical Manual of Mental Disorders (DSM-5)[2], does not treat Asperger's Disorder as a separate disorder but instead includes it as part of Autism Spectrum Disorder.  Id. at 591.  He noted that in the DSM-IV version, depression and anxiety are considered to occur in twenty-percent of Asperger's patients, but are considered to be comorbid conditions, not "biological extension[s] of Asperger's."  Id. at 592.

---

[2]  The Diagnostic & Statistical Manual of Mental Disorders is published by the American Psychiatric Association.  The most current edition is the Fifth, published in 2013, and noted above as the "DSM-5."  The previous edition is the "Text Revision" of the Fourth Edition, referred to as the "DSM-IV-TR."  The previous edition to the DSM-IV-TR is the Fourth Edition, referred to as the "DSM-IV."

Dr. Lurie rejected the diagnosis of Asperger's Disorder for Plaintiff because, in his opinion, Plaintiff "functioned at too high a level for years." Id. at 594. He remarked that Plaintiff was able to maintain a relationship with a girlfriend, work for over twenty years, engage others, and even obtain help from others. Id. These were not characteristics of someone with Asperger's. Id. He explained that a person with Asperger's would not have functioned as high as having a job in the first place. Id. He repeated his assertion that while depression and anxiety are said to occur about twenty-percent of the time in Asperger's patients, they are comorbid conditions, and are direct manifestations of Asperger's. Id. He concluded that Plaintiff had had no impairment since May 2012 based on a psychiatric disorder or from Asperger's Disorder. Id. at 596.

Based on Dr. Lurie's report, Falen recommended that the initial denial of Plaintiff's appeal be upheld. Id. at 571. In a January 28, 2015 letter, she notified Plaintiff that she was upholding the denial. Id. at 608-14. She wrote:

> It is therefore my conclusion that your disability was the result of a mental illness, which is considered a special condition under the policy, and for which benefits are limited to 24 months. Even if you carry the diagnosis of Asperger's syndrome, it is not limiting you from performing your usual occupation. Additionally, your depression and anxiety are co-morbid conditions and are not the result of your Asperger's syndrome.

Id. at 613.

This lawsuit followed.

## STANDARDS

An ERISA plan that does not contain language conferring discretion on the plan administrator is subject to a de novo standard of review. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 115 (1989). The parties agree that the proper standard of review in this case

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

is de novo.

Under a de novo standard, the court construes terms in ERISA trust agreements like any contractual provision "without deferring to either party's interpretation." Id. at 112. "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.'" Id. (quoting Restatement (Second) of Trusts § 4, cmt. d (1959)).  Under de novo review, the rules ordinarily associated with the interpretation of insurance policies apply.  Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 799 (9th Cir. 1997).  Accordingly, the doctrine of *contra proferentum* requires the court to construe ambiguities against the plan administrator.  Id.

"When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010).  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits.  Silver v. Exec. Car Leasing Long–Term Disability Plan, 466 F.3d 727, 733 (9th Cir. 2006).  Under de novo review "the burden of proof is placed on the claimant." Muniz, 623 F.3d at 1294.

In a 2012 decision, Judge Simon concluded that procedurally, the appropriate vehicle for adjudicating ERISA claims under a de novo review standard is through a bench trial based on the administrative record.  Rabbat v. Standard Ins. Co., 894 F. Supp. 2d 1311, 1314 (D. Or. 2012). As Judge Simon explained in Rabbat, a de novo standard requires the court to make findings of

14 - FINDINGS OF FACT & CONCLUSIONS OF LAW

fact and weigh the evidence which the court is forbidden to do when deciding a motion for summary judgment. Id. As an alternative to summary judgment in such cases, the court may conduct a trial on the administrative record under Federal Rule of Civil Procedure 52. Id. (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) ("the district court may try the case on the record that the administrator had before it")). In such a trial,

> "[t]he district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."

Id. (quoting Kearney, 175 F.3d at 1095; further citing Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 (7th Cir. 1994) (on de novo review of an ERISA benefits claim, the "appropriate proceeding[ ] . . . is a bench trial and not the disposition of a summary judgment motion"); Lee v. Kaiser Found. Health Plan Long Term Disability Plan, 812 F. Supp. 2d 1027, 1032 (N.D. Cal. 2011) ("De novo review on ERISA benefits claims is typically conducted as a bench trial under Rule 52.")); see also Sammons v. Regence Bluecross Blueshield of Or., No. 3:15-cv-01703-SI, 2016 WL 1171019, at *2 (D. Or. Mar. 23, 2016) (confirming that the appropriate procedure to resolve an ERISA claim subject to de novo review is through a bench trial on an administrative record), appeal docketed, No. 16-35288 (9th Cir. Apr. 19, 2016).

Although the parties have filed cross-motions for summary judgment, I construe the motions as Trial Memoranda submitted in connection with a bench trial on the Administrative Record.

## DISCUSSION

Plaintiff argues that his depression and anxiety are byproducts of his Asperger's Disorder

and because Asperger's Disorder is exempt from the LTD Policy's definition of "mental illness," his disability is not limited to twenty-four months under the "special conditions" provision. Plaintiff further suggests that the LTD Policy is ambiguous as to how symptoms of a pervasive developmental disorder such as Asperger's, are treated under the LTD Policy and because any ambiguity in the policy should be resolved against the Defendant insurer, the LTD Policy should be construed to provide coverage.

Defendant argues that (1) Plaintiff does not have Asperger's Disorder; (2) even if he does, it does not cause his anxiety and depression; and (3) even if he has Asperger's Disorder and it causes his anxiety and depression, he is still limited by the Special Conditions provision of the policy to twenty-four months of benefits.

I.  Asperger's Disorder

Dr. Babe, Plaintiff's treating physician beginning in 2012, told Dr. Neubauer in a September 2012 phone discussion that Plaintiff's clinical picture was "more complex," presumably meaning more complex than the chronic depression/dysthymic disorder Dr. Neubauer discussed in her September 6, 2012 Behavioral Health Services Assessment in which she indicated her need to contact Dr. Babe to discuss Plaintiff's condition.  Id. at 173-77.  Dr. Babe noted that Plaintiff had been seen by many different specialists and diagnosed with a variety of conditions.  Id. at 177.  Dr. Babe, however, determined that Plaintiff had Asperger's which had "flown below the radar."  Id.  Dr. Babe then described a variety of symptoms to support his opinion and functional assessment.  Id. (noting that Plaintiff had significant interpersonal issues which caused job issues; that he could not tolerate others' social behavior and then became depressed; that he became anxious in public and wanted to create relationships but

became "so anxious").

Plaintiff completed a "Behavioral Health Supplementary Report" dated December 4, 2012, with a physician portion completed by Dr. Babe on December 5, 2012. Id. at 317-18. There, Dr. Babe confirmed Plaintiff's Asperger's diagnosis (by listing then-current DSM-IV-TR Diagnosis Code 299.80). Dr. Babe noted Plaintiff's severe anxiety and stated that Plaintiff "can not interact on a daily basis in an office environment secondary to [illegible] and depression." Id.

Dr. Babe saw Plaintiff throughout 2013 and 2014. Id. at 425-44. During that time, Dr. Babe treated Plaintiff for his anxiety and depression which remained significant and crippling despite Plaintiff being able to make progress in certain settings. Id. Dr. Babe's psychiatric diagnoses continued to be major depressive disorder and Asperger's Disorder or just Asperger's Disorder. E.g., id. at 444 (March 13, 2013); 441 (April 24, 2013); 438 (June 5, 2013); 434 (August 7, 2013); 432 (Oct. 11, 2013); 429 (Jan. 6, 2014); 426 (Mar. 7, 2014).

In April 2014, Dr. Babe explained in a chart note that Plaintiff had been diagnosed with Asperger's Disorder since beginning treatment with Dr. Babe. Id. at 569. He noted, as he had in the past, that Plaintiff had had many different diagnoses over the years but in his opinion, Plaintiff's "primary and fundamental diagnosis is Asperger's, and that his Asperger's Disorder creates complications such as depression, and anxiety. Id. Dr. Babe noted that Plaintiff's previous ability to function in the work environment was only because the "circumstances were very specific and allowed him to contain his discomfort that the Asperger's caused in dealing with social circumstances." Id. After his employment conditions changed, he was required to do new things and he could no longer tolerate or control his severe symptoms. Thus, "his primary diagnosis is Asperger's" which then "exacerbates and contributes to his tremendous anxiety and

17 - FINDINGS OF FACT & CONCLUSIONS OF LAW

depression."  Id.

On December 10, 2014, Dr. Babe wrote a "To Whom it May Concern" letter regarding

Plaintiff's condition.  Id. at 527.  He explained that beginning with his first evaluation of Plaintiff

over one and one-half years earlier, and continuing throughout, Plaintiff's primary issue has been

Asperger's disorder which had been going on throughout Plaintiff's life.  Id.  He explained that

there was evidence from Plaintiff's childhood demonstrating Plaintiff's difficulty with social

interactions "subsequently causing multiple sequelae."  Id.  Dr. Babe further explained:

> [Plaintiff] in his work, developed as he describes it "a new way to do things" with
> his job which would not be surprising considering how someone with Asperger's
> tend[s] to break things down into parts.  He was then able to turn this into a
> profitable position, however it was in a very circumscribed, and very specific area
> within the company that he worked.  It is my understanding and belief that as the
> job demands and requirements became increasingly difficult and required
> significantly greater mental flexibility, he began to deteriorate.  This mental
> flexibility included the need for him to interact and to be around others as well as
> to tolerate normal work environments without irritation. [Plaintiff], as many
> people with Asperger's syndrome, also has a sensory integration difficulty, and
> loud, noisy, or even quiet environments with distracting/unpredictable noise can
> create problems.

Id.

Dr. Babe continued by explaining that while Plaintiff worked hard to maintain the

appearance of "social norm" around others, this required an overwhelming amount of mental

calculation.  Id.  This need to mentally calculate social settings, combined with an unpredictable

environment, created increased anxiety which affected his work and social life which led to

depression.  Id.  Dr. Babe stated that although "fear, anxiety, and depression have been present

for a long time, [Plaintiff] clearly was able to function at work until[] the demands of the job

overwhelmed his Asperger's and sensory integration condition."  Id.

Dr. Babe is the only one of Plaintiff's three treating psychiatrists over the years to actually

18 - FINDINGS OF FACT & CONCLUSIONS OF LAW

diagnose Plaintiff with Asperger's Disorder, but there is a mention of it in one of Dr. Schiffman's

chart notes from 2008. Tr. 541. While the handwritten note is largely illegible, it suggests that

Dr. Schiffman might have been considering whether Plaintiff had Asperger's. Id. Additionally,

another of Dr. Schiffman's chart notes refers to the possibility of whether Plaintiff had symptoms

of Attention Deficit Disorder (ADD). Id. at 546. As the DSM-IV-TR notes, "[s]ymptoms of

overactivity and inattention are frequent in Asperger's Disorder, and indeed many individuals

with this condition receive a diagnosis of Attention-Deficit/Hyperactivity Disorder prior to the

diagnosis of Asperger's Disorder." DSM-IV-TR 81.

Defendant repeatedly acknowledged Dr. Babe's diagnosis. E.g., id. at 183 (Dr.

Neubauer's Sept. 18, 2012 Assessment noting that Dr. Babe was "considering" a diagnosis of

Asperger's); 379-80 (Dr. Neubauer's Mar. 11, 2014 Assessment noting Plaintiff's Asperger's

diagnosis, stating there had been no significant change in his Asperger's condition, stating that

Plaintiff's Asperger's was present when he was working; concluding that Asperger's would not be

limiting in the absence of the comorbid depression and anxiety); 608-14 (Jan. 28, 2015 claim

denial letter acknowledging Asperger's diagnosis).[3]

---

[3] In her March 2013 Behavioral Health Services Assessment, Ashley noted Dr. Babe's
current diagnoses as major depressive disorder, recurrent, psychotic features; general anxiety
disorder; and "rule out" Asperger's. AR 347. This was based on a March 13, 2013 Behavioral
Health Supplementary Report completed by Plaintiff and Dr. Babe. Id. at 345-46. Ashley
correctly noted the diagnoses listed in the March 13, 2013 portion of the report attributed to Dr.
Babe. But, a close examination of that report shows that the diagnosis section was filled out by
someone with different handwriting than the portions completed by Dr. Babe addressing
subjective symptoms, objective findings, work capabilities, and vocational rehabilitation. Id.
While Dr. Babe did sign the report, none of his underlying chart notes refer to the Asperger's
diagnosis as a "rule out" and given that this portion of the report does not appear to have been
completed by Dr. Babe himself, I do not give the "rule out" portion of the listed Asperger's
diagnosis, any weight.

In addition to Dr. Babe's diagnosis and the suggestion in Dr. Schiffman's notes of a possible Asperger's or ADD diagnosis, the SSA also accepted Asperger's as one of Plaintiff's diagnoses. Id. at 492 (SSA ALJ found, in a September 22, 2014 decision, Asperger's to be one of Plaintiff's severe impairments). The ALJ noted Dr. Babe's diagnosis and gave great weight to his opinion. Id. at 494-95. He also found Plaintiff credible. Id.

In support of its position that Plaintiff does not have Asperger's Disorder in the first place, Defendant argues that Dr. Babe is the "first and only" psychiatrist to offer the diagnosis, and further, that Dr. Babe did not have the benefit of Plaintiff's prior medical records. Defendant states that treating physicians Dr. Schiffman and Dr. Benbow, and examining/consulting physician Dr. Stahl, did not diagnose Asperger's. Defendant then relies on non-examining physician Dr. Lurie's conclusion that Plaintiff's prior clinical history and current activity level did not support the diagnosis. Defendant surmises that Plaintiff somehow convinced Dr. Babe to diagnose him with Asperger's to avoid the twenty-four month limitation for mental illness. See Def.'s Mot. 12.

I reject Defendant's argument. First, while Dr. Babe is the only one of three treating psychiatrists to affirmatively diagnose Plaintiff with Asperger's, Dr. Schiffman's notes refer to it, along with ADD which is often a "pre"-Asperger's diagnosis, as a possible diagnosis. Second, Dr. Babe spoke to Dr. Neubauer in September 2012 and at that time, told her that in his opinion, Plaintiff had Asperger's which had been "under the radar." Plaintiff learned of the twenty-four month limitation in Defendant's November 2012 claim acceptance letter, after Dr. Babe had diagnosed him with Asperger's. This refutes any argument by Defendant that Plaintiff somehow pressured Dr. Babe into issuing the Asperger's diagnosis in order to avoid the twenty-four month

20 - FINDINGS OF FACT & CONCLUSIONS OF LAW

limit.

Third, Dr. Lurie's reasons for concluding that Plaintiff does not have Asperger's are unconvincing because they are not supported by the record. Dr. Lurie gave only two reasons for rejecting the determination that Plaintiff has Asperger's Disorder: that Asperger's no longer exists as a diagnosis and that Plaintiff had functioned at too high a level for years.

The DSM-IV-TR recognized Asperger's as a separate disorder, distinct from what was then called Autistic Disorder and other pervasive developmental disorders, "all of which are characterized by problems in social interaction." DSM-IV-TR 82. In the subsequent and current edition, the DSM-5, the broader Autism Spectrum Disorder now encompasses Asperger's Disorder. DSM-5 53. That Asperger's Disorder has been folded into a broader category simply means it is no longer a separate disorder. The classification change does not mean that the symptoms and characteristics which previously constituted Asperger's do not continue to support a discernable disorder. Thus, the fact that Asperger's Disorder is not currently recognized as an independent disorder is not a reason for rejecting a conclusion that Plaintiff has a pervasive developmental disorder (PDD).[4]

As Dr. Babe has noted, and as the DSM-IV-TR makes clear, Asperger's Disorder is "a continuous and lifelong disorder." DSM-IV-TR 82. For someone with a PDD, Plaintiff has functioned at a fairly high level. But, Dr. Lurie's conclusion that he functioned "at too high" a level is not supported by the record.

It is true that Plaintiff managed to work for many years. But, Dr. Benbow's September 2012 letter makes clear that Plaintiff had significant problems at work. He wrote:

---

[4] Moreover, the LTD Policy language refers to the DSM-IV-TR, not the DSM-5.

> While in San Diego under my care, Mr. Leight was unable to go to work on a regular basis, he had frequent absenteeism due to problems with extreme anxiety and depression.  Even when he did go to his office he was unable to engage in productive work and would frequently become internally preoccupied or need to go outside.  He. . . . has been unable to work productively for quite some time but he [had] a supportive employer who was surprisingly tolerant.

Id. at 182.

Other references in the record also suggest that Plaintiff had trouble coping at work.  E.g., AR 546 (Sept. 5, 2007 chart note of Dr. Schiffman remarking on Plaintiff not completing tasks at work); AR 538 (May 21, 2009 chart note of Dr. Schiffman noting Plaintiff's inability to concentrate and get work done); AR 533 (Mar. 21, 2010 chart note of Dr. Schiffman noting Plaintiff's plan to return to full-time work very soon).  The record does not support a conclusion that Plaintiff's employment was without problems attributable to anxiety and/or depression or was possible absent accommodation from his employer.

And, while Dr. Lurie also noted Plaintiff's having had a girlfriend as an indication that he functioned at too high a level to have an Asperger's diagnosis, the record, to the best of my knowledge, contains references to a "girlfriend" twice in Plaintiff's life - once at the end of high school and once in 2010.  AR 551 (Dr. Stahl's June 2, 2010 report, noting Plaintiff's history that he had a girlfriend after completing high school, and had recently lost a girlfriend to a breakup).  There is no information about how long these relationships were sustained, what they actually consisted of (e.g., did they live together, manage a household or finances together, etc.), or whether Plaintiff's disorder was a factor in the breakup.  Without such information in the record, Dr. Lurie's implicit conclusion that Plaintiff was capable of sustaining a long-term meaningful romantic relationships is purely speculative.

I credit Dr. Babe's diagnosis of Asperger's and reject Dr. Lurie's conclusion that Plaintiff

22 - FINDINGS OF FACT & CONCLUSIONS OF LAW

did not have the disorder.  It is undisputed that although both Dr. Babe and Dr. Lurie are board-certified psychiatrists, Dr. Babe had a personal relationship with Plaintiff sustained over a period of a couple of years.  In contrast, Dr. Lurie never examined Plaintiff.  Although a treating physician's opinion is not afforded deference in an ERISA disability claim, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003), "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."  Paese v. Hartford Life & Acc. Ins. Co., 449 F.3d 435, 442 (2d Cir. 2006); see also Black & Decker, 538 U.S. at 832 ("it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual") (internal quotation marks and alterations omitted).

Dr. Lurie's opinion is not supported because first, the fact that Asperger's is no longer its own diagnosis does not mean that the condition ceases to exist and second, the record establishes that Plaintiff has not functioned as well as Dr. Lurie suggests and thus, his conclusion that Plaintiff's level of functioning is inconsistent with a diagnosis of Asperger's Disorder is not based on the facts in the record.  Dr Babe's opinion carries more weight because of his personal relationship with Plaintiff and its consistency with earlier references to Plaintiff's problems at work and with social anxiety.

## II.  Anxiety & Depression

Plaintiff contends that the record supports a finding that his anxiety and depression result from his Asperger's Disorder.  Defendant argues that the anxiety and depression exist independently of the Asperger's diagnosis and are comorbid conditions.  Defendant disputes that Asperger's Disorder is a cause of Plaintiff's depression and anxiety or that the depression and

anxiety are symptoms of Asperger's Disorder.

Dr. Babe's treatment notes and opinion support Plaintiff's position.  In April 2014, he stated that Plaintiff's Asperger's "creates" complications such as depression and anxiety and that Plaintiff's primary and fundamental diagnosis is Asperger's Disorder.  AR 569.  He also noted that the primary diagnosis of Asperger's exacerbates and contributes to the anxiety and depression.  Id.

In December 2014, Dr. Babe stated again that Plaintiff's primary issue was Asperger's disorder which had been present throughout his life.  Id. at 527.  Dr. Babe suggested that the mental requirements of appearing socially normal combined with unpredictable environment cause anxiety.  Id.  With changes in his job demands, Plaintiff had increased problems at work as a result of his Asperger's disorder and these problems at work caused increased depression.  Id. Dr. Babe also remarked that evidence from Plaintiff's childhood shows he had difficulty with social interactions, causing multiple sequelae.  Id.

There are other references in the record to Plaintiff's anxiety or depression being caused by his social adjustment problems attributable to Asperger's.  E.g., id. at 177 (Dr. Babe noting in September 2012 that Plaintiff had significant interpersonal issues which affected him in the workplace and that he became depressed because of his inability to tolerate others' social behavior); 182 (Dr. Benbow noting in September 2012 that social anxiety was a "prominent" feature of Plaintiff's disorder).

In contrast to this evidence in the record, Dr. Neubauer's and Dr. Lurie's opinions support Defendant's position.  Dr. Neubauer initially rejected that Asperger's played a role in Plaintiff's inability to work because it is a developmental disorder which is present throughout life cycles.

24 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Id. at 173-75. She later explained that the depression and anxiety were, in her opinion, not symptoms which were physiologically attributable to Asperger's and that Plaintiff's depression and anxiety were caused by major depressive disorder and generalized anxiety disorder. Id. at 380. She concluded that Plaintiff's Asperger's would not be limiting in and of itself, but was limiting for Plaintiff only because of his "comorbid depression and anxiety." Id. A few months later, she adhered to this conclusion, noting that Plaintiff had been able to function in the work setting for many years with his Asperger's Disorder and that the depression and anxiety which were presently limiting him were comorbid conditions and did not result from his Asperger's. Id. at 457-59.

In his report, Dr. Lurie relied on the DSM-IV to state that while depression and anxiety occur in about twenty-percent of Asperger's patients, they are considered comorbid conditions, not "biological extension[s]" of Asperger's. Id. at 592 (citing unspecified page or section of "DSM-4 (DSM-IV)"). He rejected the conclusion that depression and anxiety were direct manifestations of Asperger's. Id. at 594.

The DSM-IV-TR states that the "social deficits and restricted patterns of interest, activities, and behavior are the source of considerable disability" for those with Asperger's. DSM-IV-TR 80. It also explains that "[o]ften the social disability of individuals with the disorder becomes more striking over time[,]" although by adolescence, "some individuals with the disorder may learn to use areas of strength (e.g., rote verbal abilities) to compensate for areas of weakness." Id. at 81. The DSM-IV-TR further explains that "Asperger's Disorder has been reported to be associated with a number of other mental disorders, including Depressive Disorders." Id. It recognizes that some individuals with Asperger's "experience heightened and

debilitating anxiety in social settings" similar to "Social Phobia or other Anxiety Disorders." Id. at 83.  The latter disorders, however, are not characterized by pervasive impairments in social development.  Id.  In Asperger's, the "social deficits are quite severe and the preoccupations are all-encompassing and interfere with the acquisition of basic skills."  Id.

The DSM-IV-TR expressly recognizes that Asperger's is a contributing cause of depression and anxiety.  Id. at 81-82.  It states that "feelings of social isolation and an increasing capacity for self-awareness[] may contribute to the development of depression and anxiety in adolescence and young adulthood."  Id. at 82.

The DSM-IV-TR, which the LTD Policy uses to define mental illness and which was the current version of the DSM at the time Plaintiff applied for disability, does not contain the information Dr. Lurie cited and relied on regarding the percentage of Asperger's patients who also suffer anxiety and depression and the comorbidity of those conditions.  I also reviewed the DSM-IV, the version cited by Dr. Lurie.  In the section devoted to Asperger's Disorder, 299.80, I found no mention of anxiety or depression, its percentage of occurrence in Asperger's patients, or the fact that they are comorbid conditions rather than manifestations of the disorder.  DSM-IV 75-77.

To be thorough, I reviewed the DSM-5 as well.  That edition, as noted above, classifies Asperger's Disorder as part of Autism Spectrum Disorder.  It notes that adults who previously developed compensation strategies for social challenges can still struggle in novel or unsupported situations and "suffer from the effort and anxiety of consciously calculating what is socially intuitive for most individuals."  DSM-V 53.  It explains that adults with the disorder "are prone to anxiety and depression."  Id.  The current edition recognizes that some individuals are first

diagnosed with the disorder in adulthood and even those who have superior and language and intellectual abilities and who have been better able to function independently, may still "remain socially naive and vulnerable, have difficulties organizing practical demands without aid, and are prone to anxiety and depression." Id. Finally, in a section discussing "comorbidity," the DSM-5 notes that many individuals with autism spectrum disorder have psychiatric symptoms that are not part of the diagnostic criteria for the disorder. Id. at 58 (noting that about seventy percent of those diagnosed with autism spectrum disorder may have one comorbid mental disorder, and forty percent may have two comorbid mental disorders).

None of the versions of the DSM that I consulted contain the information reported by Dr. Lurie. Accordingly, his discussion of what the DSM-IV states about Asperger's is unsubstantiated. Instead, the DSM-IV-TR and the DSM-5 indicate that anxiety and depression are common byproducts of individuals with Asperger's/Autism Spectrum Disorder. The manner in which these DSM editions discuss the relationship between the disorder and anxiety and depression indicates that anxiety and depression are symptoms of the disorder even though they are not part of the diagnostic criteria.

While the DSM-5 uses the term "comorbid," and Dr. Neubauer and Dr. Lurie rely on that term to conclude that Plaintiff's anxiety and depression exist independently of his Asperger's and are not caused or exacerbated by Plaintiff's Asperger's, the definition of the term "comorbid" is the subject of debate. For example, in one medical dictionary, it is defined as "[a] disease that worsens or affects a primary disease." Taber's Cyclopedic Medical Dictionary 498 (21st ed. 2005). This definition does not mandate that the "disease" and "primary disease" are independent of each other. In an online dictionary, the term is defined as: "pertaining to a disease or other

27 - FINDINGS OF FACT & CONCLUSIONS OF LAW

pathological process that occurs simultaneously with another."

http://medical-dictionary.thefreedictionary.com/comorbid (citing <u>Miller-Keane Encyclopedia and</u>

<u>Dictionary of Medicine, Nursing, and Allied Health</u> (7th ed. 2003)).  Simultaneously is not

necessarily independently.

  Other online resources offer differing definitions.  Merriam-Webster online defines

"comorbid" as "existing simultaneously with and usually independently of another medical

condition," http://www.merriam-webster.com/dictionary/comorbid, while Dictionary.com offers

a definition of comorbid for medical conditions as "present simultaneously in a patient."

http://www.dictionary.com/browse/comorbid.  Yet another online source notes that there are

various definitions of the term:

> Comorbid, in medicine, refers to a disease or condition that occurs at the same
> time as another illness. Dictionary definitions differ:  Some say comorbidity refers
> to two or more illnesses that occur simultaneously[;] [s]ome say it refers to one or
> more illnesses that occur at the same time as a primary condition[;] [and] [s]ome
> say it refers to two or more conditions that are present at the same time and
> independently of each other.

http://www.healthcentral.com/bipolar/c/687619/157618/comorbid/.

  In a 2009 article published in the Annals of Family Medicine, the authors stated that there

"is no agreement, however, on the meaning of the term [comorbidity]."  Valderas, Jose M. et al.

"<u>Defining Comorbidity: Implications for Understanding Health and Health Services.</u>" Annals of

Family Medicine 7.4 (2009): 357–363 (available at

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2713155/) (further explaining that "[a]ttempts to

study the impact of comorbidity are complicated by the lack of consensus about how to define

and measure the concept.").

  Given the unclear definition of the term, the DSM-5's reference to "comorbid" conditions

does not mean the conditions must exist independently of each other. I am also not persuaded that Dr. Neubauer's and Dr. Lurie's references to Plaintiff's anxiety and depression being "comorbid" conditions establishes that they exist independently of Plaintiff's Asperger's Disorder. The DSM-IV-TR and the DSM-5 support Dr. Babe's conclusion that Asperger's causes, creates, or at least exacerbates Plaintiff's anxiety and depression. Accordingly, I agree with Plaintiff that Plaintiff's Asperger's and depression and anxiety "cannot be uncoupled." Pl.'s Mot. 24.

III. Policy Provisions

The LTD Policy exempts PDDs from the definition of "Mental Illness." There is no dispute that Asperger's Disorder is such a disorder. The twenty-four month "Special Conditions" limitation on disability benefits applies only if the person has a mental illness in the first place. Given that Plaintiff's Asperger's Disorder is not a mental illness under the LTD Policy, and given my conclusion that the record establishes that Plaintiff's anxiety and depression are caused or exacerbated by his Asperger's Disorder, those conditions are not subject to the "special conditions" limitation because they are symptoms or manifestations of a PDD and are not mental illnesses under the LTD Policy. Even though the LTD Policy includes mental illnesses related to or caused by physical or biological factors as a "mental illness," that does not alter my conclusion. The policy language expressly defines mental illness to exclude PDDs and thus, the provision of the policy stating that "[a] *mental illness*, as so defined, may be related to or be caused by physical or biological factors" does not apply at all. With a PDD, Plaintiff does not have a mental illness in the first instance.

Even if Plaintiff's anxiety and depression are considered "mental illnesses," the "special conditions" limitation would still not apply. If the person has the "stated condition" of a mental

29 - FINDINGS OF FACT & CONCLUSIONS OF LAW

illness, the special conditions twenty-four month exclusion does not apply if the person has another condition which, absent the mental illness, continues to exist and limits activities such that the person is disabled. Defendant's argument is that Plaintiff's Asperger's Disorder is "another condition" which, absent the anxiety and depression, continues to exist but does not limit his activities to the point of disability. The problem for Defendant is that the LTD Policy either entitles Plaintiff to coverage or is ambiguous and is therefore construed to provide coverage.

Given the relationship between Plaintiff's Asperger's Disorder and his anxiety and depression, the LTD Policy cannot be applied to effectively erase the anxiety and depression. That is, the "another condition" of Asperger's Disorder which is not subject to the "special conditions" exclusion because it is not a mental illness, cannot be viewed in isolation when it produces disabling symptoms which are mental illnesses. In a different situation, the LTD Policy's "another condition" would clearly have no relationship to the limited special condition and application of the limitation would be warranted. For example, a claimant with bipolar disorder may also have vision problems which the claimant alleges are disabling. In analyzing the special condition provision, the insurer could conclude first, that the claimant had a stated condition of a mental illness. Then, second, if the medical record supported it, the insurer could conclude that the claimant's vision problems did not, absent the bipolar disorder, limit the claimant's activities to the point of disability and thus, the special conditions twenty-four month limitation would apply.

But, when the "another condition" produces symptoms which cause the disabling limitations, the LTD Policy's special conditions language, which is directed at independent

"conditions," does not apply.  Alternatively, the LTD Policy is ambiguous in situations when a PDD manifests as a mental illness.  In a similar case, Magistrate Judge Coffin concluded that a policy was ambiguous when the claimant's migraines caused depression.  <u>Kitterman v. Standard Ins. Co.</u>, No. 09-cv-6294-TC, 2011 WL 1541310, at **1-4 (D. Or. Apr. 21, 2011).  The policy at issue limited payment of long-term disability benefits to twenty-four months if the disability was "caused or contributed to by a Mental Disorder."  <u>Id.</u> at *1.  "Mental Disorder" meant a "mental, emotional or behavioral disorder."  <u>Id.</u>  The defendant argued that the plaintiff's depression was independently disabling and that his migraines were a separate long-standing condition that was not disabling.  <u>Id.</u>

Judge Coffin concluded that contrary to the defendant's factual assertion, the record established that the plaintiff's migraines were a cause of his depression.  <u>Id.</u> at *2.  With that determination, he then concluded that the policy limitation was ambiguous given that the plaintiff's disability was caused by both mental and physical health problems, or a "mixed condition."  <u>Id.</u> at **2-5.  Relying on earlier Ninth Circuit cases which addressed the application of similarly limiting provisions to disabilities produced by related physical and mental illnesses, Judge Coffin concluded the policy was ambiguous.  <u>Id.</u> (discussing and citing <u>Lang</u>, 125 F.3d at 799; <u>Patterson v. Hughes Aircraft Co.</u>, 11 F.3d 948, 950 (9th Cir. 1993)).

Although Plaintiff here does not have a physical illness, because the Asperger's Disorder is exempt from the definition of "mental illness," it is akin to physical illnesses which are covered under the LTD Policy.  As a result, the discussions in <u>Kitterman</u> and the cases it cites are instructive regarding the ambiguity of similar policy provisions when those provisions are applied to "mixed-condition" disabilities.

Defendant argues that these cases are distinguishable because unlike the policies in those cases, the LTD Policy here specifically defines "mental illness" as a mental illness related to or caused by physical or biological factors.  This might help Defendant if, as in Kitterman, Plaintiff's anxiety and depression were caused by a physical or biological factor.  Here, the LTD Policy does not define "physical or biological factor."  And, given that Asperger's and now Autistic Spectrum Disorder are conditions diagnosable under the DSM "of Mental Disorders," Asperger's is not a "physical or biological factor."  Further, as noted above, because PDDs are specifically exempted from the definition of mental illness, Plaintiff's disorder is not subject to the "related to or caused by physical or biological factors" policy language in the first instance.  Thus, just like the policies at issue in Kitterman and the cases it cites, the LTD Policy here is ambiguous because it does not clearly exclude a PDD which produces anxiety and depression from the "special conditions" twenty-four month limitation.  As such, the doctrine of *contra proferentum* which provides that "ambiguities in insurance contracts must be construed against the insurer," Sanders v. CNA Grp. Life Assur. Co., 322 F. Supp. 2d 1142, 1145 n.2 (D. Or. 2004), applies in favor of coverage for Plaintiff.  See Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 539–40 (9th Cir. 1990) (rule of *contra proferentum* applies to ERISA insurance polices); see also Sanders, 322 F. Supp. at 1145-46 (explaining that the doctrine does not apply to a court's abuse of discretion review of an ERISA plan's determination but it does apply to a de novo review).

CONCLUSION

Based on the Administrative Record, the Court construes the motions for summary judgment [41, 42] as Trial Memoranda in connection with a bench trial.  For the reasons

32 - FINDINGS OF FACT & CONCLUSIONS OF LAW

explained herein, the twenty-four month limitation on disability benefits in the LTD Policy does

not apply.  As a result, I find in favor of Plaintiff.  Plaintiff shall prepare an appropriate Judgment

consistent with these Findings & Conclusions, and after conferring with Defendant, shall submit

it to the Court for signature within 14 days of the date below.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016

Marco A. Hernandez
United States District Judge